IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

MARC EMMERICK, )
        Plaintiff )
v. ) No. 3:07-cv-13
   (Phillips/Guyton)
MARSHA PENLEY-GROSECLOSE )
and S&K FAMOUS BRANDS, INC., )
        Defendants )
)

**MEMORANDUM OPINION**

The *pro se* plaintiff, Mark Emmerick ("Emmerick"), seeks $125,000 in compensatory damages in this lawsuit against defendants S&K Famous Brands, Inc. ("S&K"), and Marsha Penley-Groseclose ("Groseclose"),[1] the District Manager for S&K, based on state law causes of action for negligent infliction of emotional distress and retaliatory discharge.[2] Emmerick originally filed this action in the Circuit Court for Sevier

---

[1] According to Groseclose's undisputed affidavit, her previous name was Marsha Penley-Groseclose; her present nomenclature is just Marsha Groseclose [*see* Doc. 22-2, p.1].

[2] Page 1 of the *pro se* complaint also asserts a third cause of action for discharge in violation of Tenn. Code Ann. § 50-1-304 ("Discharge for refusal to participate in or remain silent about illegal activities ... ."). A fair reading of the complaint, however, sets forth no factual allegations in support of that theory as opposed to the other two theories. Moreover, in his deposition, Emmerick confirms that he intends to assert only the first two causes of action: "[T]here are just two counts, as stated later on in the complaint. ... [T]he emotional and physical distress [claim], and the wrongful termination ... retaliatory discharge [claim]." [Doc. 22-4, pp.28-29 (actual deposition page numbers

County, Tennessee, on December 8, 2006, after his part-time employment with S&K was terminated after three months [*see* Doc. 1, pp.8-16].  On January 12, 2007, the defendants timely removed the action to this court, *see* 28 U.S.C. § 1446(b), based on diversity of citizenship of the parties[3] and the amount in controversy exceeding $75,000.  *See* 28 U.S.C. § 1332(a)(1).

This matter is presently before the court on the following motions:

1. Defendants' motion for summary judgment [Doc. 21];  and

2. Plaintiff's motion for hearing on request for summary judgment [Doc. 23].

The issues raised have been briefed by the parties [*see* Docs. 22, 23, and 24] so that this matter is now ripe for adjudication.  For the reasons that follow, defendants' motion will be granted whereby summary judgment will be entered in defendants' favor and this case dismissed against them.  Consequently, plaintiff's motion for a hearing will be denied as moot.

---

184-85)].  In view of Emmerick's testimony, the court will consider this complaint as setting forth two causes of action only.

[3]Emmerick is a citizen of the State of Tennessee [Doc. 1, pp.8-9];  Groseclose is a citizen of the Commonwealth of Virginia [*id.*, p.18];  and S&K's principal place of business is in the Commonwealth of Virginia, where S&K is incorporated [*id.*].

I.

*Factual Allegations*

The facts of this case will, of course, be viewed in the light most favorable to Emmerick. S&K is a retailer of menswear, operating approximately 250 stores in the Eastern United States [Doc. 22-2, p.1]. Among S&K's stores is one located in Pigeon Forge, Tennessee [*id.*]. Groseclose has been employed by S&K as its District Manager at all times relevant to this litigation and, in that capacity, has management responsibility for the supervision of six stores, including the one in Pigeon Forge [*id.*].

Emmerick completed an application for employment in S&K's Pigeon Forge location on August 25, 2006 [*see* Doc. 22-5, p.15] and was hired a few days later on September 1st [*see* Doc. 22-4, p.6].[4] Emmerick was hired on a part-time basis, scheduled to

---

[4]All pages references to Emmerick's deposition will be to the docket entry page number - not the actual page number of the deposition itself. It must also be noted at this juncture that S&K's quick hiring of Emmerick was based on the representations or, more accurately, misrepresentations in his application. In the "Education" section of the application, Emmerick indicated that he had completed four years of high school, three and a half years of college, and three and a half years of work towards a Ph.D. in Theology [*see* Doc. 22-5, p.15]. It must be noted too that Emmerick signed his application under a statement which represented, among other things, that he "certif[ied] that the statements and information furnished by me in this application are true and correct." [*Id.* at p.17]. Yet, in his deposition, Emmerick was asked how far he had gone in school, to which he responded:

    A.  I kind of stopped going in the eighth grade and went once in a while up through the 10th grade. ...  After the tenth, I never went back. ...

    Q.  So, do you have a high school diploma?

    A.  No.

work about 24 hours per week [*id.*, p.7]. Emmerick's initial rate of compensation was $7.00 an hour, and his job duties included sales, stocking, and restocking merchandise [*id.* at p.8].

It is undisputed that during his brief employment of three months, Emmerick reported to Groseclose and to Brenda Peck ("Peck"), the Employment Director of S&K, that certain employees in the Pigeon Forge store were engaging in conduct which violated company policy [*see* Doc. 22-2, p.2; Doc. 22-3, p.2]. More specifically, Emmerick reported that some employees had worn merchandise before they had paid for it, that at least one employee had borrowed cash from the cash register without leaving an IOU, and that employees had thrown coins, candy and coat hangers in the store [Doc. 22-3, p.2]. During his deposition, Emmerick confirms that his own handwritten notes from the conversations that he had with Groseclose and Peck are consistent with S&K's records with respect to the behavior of other employees about which he was complaining: ties and shirts were worn and returned to stock; shorting the cash drawer without leaving an IOU; the failure of co-workers to clean store windows; and their talking on cell phones, napping, taking smoke breaks, and making rude noises [*see* Doc. 22-4, pp.23-26]. Emmerick further testifies that his notes also reflect other acts of his co-workers that he deemed misbehavior -- addresses for his customers appearing on other employees' postcard mailing lists, objects thrown in the

[Doc. 22-4, p.2]. Emmerick further testified that he had never been enrolled as a student in a community college, nor was he enrolled in any other school thereafter [*id.* at pp.2-3]. Based on this evidence alone, the court concludes that Emmerick has serious credibility issues. And, as will be discussed later in this opinion, Emmerick has made other misrepresentations, this time to the court.

4

store such as hangers, cardboard, coins, and candy, as well as coat hangars which skidded under the restroom door [*id.* at p.27].

It is also undisputed that after Emmerick reported this inappropriate co-worker behavior to Peck through the company hotline, Peck directed that Groseclose go immediately to the store and investigate [*see* Doc. 22-2, p.2; Doc. 22-3, p.2]. Although Groseclose did not discover any "unlawful conduct," she testifies that two employees did acknowledge that they had engaged in some of the incidents reported by Emmerick, in violation of company policy [Doc. 22-2, p.2; Doc. 22-3, p.2]. Consequently, those two employees were promptly dismissed [*id.*]. Groseclose then informed Emmerick that those who engaged in the misconduct had been terminated and she "encouraged him to focus on creating a professional work environment and increasing his sales." [Doc. 22-2, p.2].

Finally, it is undisputed that approximately three weeks after these other employees were dismissed, Emmerick worked his last day at S&K when he was suspended with pay [*see* Doc. 22-4, p.9; *see also* Doc. 22-2, p.3]. [5] Emmerick admits that he was later terminated after being suspended with pay [*see* Doc. 22-4, p.9]. Groseclose testifies verbatim as follows regarding the reason for Emmerick's discharge:

---

[5]The record is somewhat murky as to the final date of Emmerick's employment at S&K. In his complaint, Emmerick alleges that it was "[o]n or about November 30, 2006." [Doc. 1, p.12]. In his deposition, Emmerick testifies that he left on November 28, 2006 [*see* Doc. 22-4, p.9]. The exact date of Emmerick's departure, however, has no impact on the court's analysis of the issues raised in the pending motion.

        \* \* \*

 6.  The decision to discharge the plaintiff approximately three weeks later was the direct result of his disruptive behavior in the store in interactions with co-workers, and his rude, argumentative and insubordinate conduct towards me when I tried to meet with him to discuss his actions and his work. He yelled, repeatedly calling me "liar" and said I was "full of it." As he was too disruptive to remain in the workplace, I suspended him pending consultation with senior management. Following such consultation, the decision was made at the corporate office to terminate his employment.

 7.  The decision to discharge Mr. Emmerick was the direct result of his own insubordinate behavior [and] was consistent with disciplinary action taken against other employees who have engaged in similar workplace misconduct. His discharge was completely unrelated to his commendable decision, a month earlier, to report actions by others which he believed to be in violation of company policy.

[Doc. 22-2, p.3]. Peck's testimony on this issue is completely consistent with Groseclose's, although it must be emphasized that Peck's decision to terminate Emmerick's employment was undertaken only after she had "consult[ed] with others who had been in the store, and members of senior management ... ." [*Id.*].

In his deposition, Emmerick admits that he did, in fact, call Groseclose "a liar," and acknowledges that he "may have interfered" with the training of a new employee [*see* Doc. 22-4, pp.10-11]. Moreover, Emmerick admits that, during the course of that conversation with Groseclose, he "raised [his] voice ... to make [his] point." [*Id.*, p.12].

On December 8, 2006, approximately a week after his termination, Emmerick filed this *pro se* lawsuit in the Circuit Court for Sevier County, Tennessee [*see* Doc. 1, pp.8-16]. On March 15, 2007, after removal to this court, Emmerick filed a motion for appointment of counsel [Doc. 6] in which, among other things, he made the following verbatim representations:

* * *

    2.    I have made the following efforts to obtain counsel:

        (a) I have sought legal services through the ACLU of Tennessee. (No response),

        (b) legal aid in Knoxville. (no provisions for type of case),

        (c) I have sought legal services through individual Attorneys with Fee paid

        (d) I have sought legal services through individual Attorneys without payment of fee,

        (e) I have sought legal services through individual Attorneys on a contingent fee basis[.] In all attempts I Have Been unable to services of counsel.

[*Id.*, p.2].[6] In his deposition, without being reminded of his representations to the court, Emmerick was questioned about his efforts to obtain counsel in this case. Emmerick's responses were as follows:

---

[6]The record reflects that the trial judge originally assigned to this case, the Honorable James H. Jarvis, II, denied that motion on March 26, 2007 [*see* Doc. 10].

7

> Q. Did you – other than your request for appointment of counsel, did you make any efforts to engage counsel on this case?
>
> A. No. No, I did not. I didn't feel a need to. ...
>
> Q. Mr. Emmerick, when you filed your motion for the appointment of counsel, you represented in an affidavit to the Court that you had made efforts to obtain legal counsel through the ACLU of Tennessee, Legal Aid in Knoxville, through individual attorneys with fee paid[,] through individual attorneys without payment of fee, and through individual attorneys on a contingent fee basis?
>
> . . .
>
> A. ... Yeah. I wrote a letter to the ACLU. I called their number. I contacted a man in Chattanooga who is a labor lawyer.

[Doc. 22-4, pp.4-5].

The court feels compelled to juxtapose Emmerick's representations in his affidavit with the answers given in his deposition because his deposition testimony does not, at a minimum, measure up to the representations set forth in his affidavit. Either Emmerick has forgotten the bulk of his efforts which he represented that he had undertaken to obtain counsel in this case or he grossly misled the court regarding those efforts. Either way, the court states for the record that Emmerick's testimony – combined with the obviously false information set forth on his employment application with S&K – greatly reduces, if not destroys, Emmerick's credibility in this case. It must be emphasized, too, that this matter is

set for a bench trial – not a jury trial – on November 7, 2007. Thus, the court would be the final arbiter of Emmerick's credibility if this case were to proceed to trial. However, given other testimony by Emmerick which will be discussed shortly, there is no basis for this lawsuit to proceed on either claim.

II.

*Summary Judgment Standards*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist. *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323.

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question; but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 251-52. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

III.

*Negligent Infliction of Emotional Distress Claim*

In count one of his complaint, Emmerick alleges a cause of action for negligent infliction of emotional distress. In *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), the Tennessee Supreme Court identified the necessary elements to establish a prima facie case of the negligent infliction of emotional distress in order to avoid entry of summary judgment:

> [W]hat is required to make out a prima facie case? After considering the strengths and weaknesses of the options used in

10

> other jurisdictions, we conclude that these cases should be analyzed under the general negligence approach discussed above. In other words, the plaintiff must present material evidence as to each of the five elements of general negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause ... in order to avoid summary judgment. Furthermore, we agree that in order to guard against trivial or fraudulent actions, the law ought to provide a recovery only for "serious" or "severe" emotional injury. ... A "serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." ... Finally, we conclude that the claimed injury or impairment must be supported by expert medical or scientific proof. ...

915 S.W.2d at 446 (citations and parenthetical information omitted).

In response to questions relating to any medical treatment which he had received, Emmerick testifies that he had received only a "overall health evaluation" at the Interfaith Clinic [Doc. 22-4, p.20]. In response to questions as to whether that overall evaluation included any evaluation with respect to the emotional injury he claimed to have suffered in this case, Emmerick testifies, "No. I didn't seek emotional counseling through them. I was pretty much capable of dealing with myself." [*Id.*]. Furthermore, Emmerick testifies that he has not seen any healthcare professional with respect to his alleged emotional stress [*id.* at pp.20-21]. When inquiry was made as to why he had not sought medical treatment, Emmerick testifies that, "My biggest issues that I am dealing with are my teeth that are most painful ... ." [*Id.* at p.22]. Finally, in response to S&K's Interrogatory 7, asking

Emmerick to identify each person he expects to call as an expert witness, Emmerick states, "Plaintiff has [n]o plans to call expert witnesses." [*See* Doc. 25-3, p.7].

Thus, the undisputed record indicates that Emmerick has failed to seek any medical treatment or evaluation based on his claim of negligent infliction of emotional distress. Moreover, Emmerick has identified no expert witness to testify on his behalf regarding any sort of emotional injury, much less one that could be termed "serious" or "severe." *See Camper*, 915 S.W.2d at 446. Emmerick will thus be unable to meet the standards articulated by the Tennessee Supreme Court in *Camper* to establish a prima facie case based upon the negligent infliction of emotional distress. That being said, defendants' motion for summary judgment on this claim must be granted as a matter of law.

IV.

*Retaliatory Discharge Claim*

The remaining claim set forth in Emmerick's complaint is one for retaliatory discharge based on the common law of Tennessee. In *Crews v. Buckman Labs. Int'l, Inc.* 78 S.W.3d 852 (Tenn. 2002), the Tennessee Supreme Court set forth the elements required to establish a retaliatory discharge claim:

> In Tennessee, the elements of a typical common-law retaliatory discharge claim are as follows: (1) that an employment-at-will relationship existed; (2) that the employee was discharged[;] (3) that the reason for the discharge was that

> the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Id.* at 862 (citations omitted).

Here, defendants stipulate, for purposes of the pending motion, that the first two elements are satisfied, *i.e.*, that an employment-at-will relationship existed between S&K and Emmerick and that Emmerick was discharged [*see* Doc. 22, p.7]. Defendants, however, contend that Emmerick has come forward with no admissible evidence sufficient to establish a genuine issue of material fact with respect to the remaining two elements, *i.e.*, that the reason for the discharge was that Emmerick attempted to exercise a statutory or constitutional right or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision, and that a substantial factor in S&K's decision to discharge Emmerick was his exercise of protected rights or compliance with clear public policy.

In order to demonstrate the absence of improper motivation, defendants rely on an extremely lengthy citation to Emmerick's deposition [*see* Doc. 22, pp.8-13 (citing Doc. 22-4, pp.30-33 and Doc. 22-5, pp. 2-13)]. While the court does not intend to set forth this

entire deposition excerpt, suffice it to say that the court has reviewed carefully this testimony to determine the precise nature of Emmerick's complaints as to what he perceived as co-workers' conduct which violated S&K's policy or which was illegal. A review of Emmerick's deposition testimony indicates that he believed "tax fraud" was transpiring; however, this so-called "tax fraud," upon further scrutiny, amounts to nothing more than Emmerick's contention that S&K's discounts during its sales reduce sales tax, hardly an illegal consequence. Furthermore, Emmerick contends that S&K's part-time alterationist should not be permitted to provide services independently to non-S&K customers without running those transactions through S&K's cash registers. Nevertheless, even if this speculative testimony amounted to any illegal conduct, which clearly it does not, the most telling bit of testimony is that Emmerick did not even perceive that his purported disclosure of these illegal acts even constituted the motivating factor for his discharge [*see* Doc. 22-4, p.30]. In short, Emmerick is unable to identify any statutory or constitutional right which, when exercised by him, was resisted to any degree by S&K's management. Emmerick is therefore totally unable to satisfy the third element of his retaliatory discharge claim.

Finally, Emmerick offers no evidence whatsoever to refute the declarations of Peck and Groseclose setting forth legitimate, non-retaliatory business reasons for his discharge. To the contrary, Emmerick admits that he engaged in behavior which is not only inappropriate, but borders on insubordination. It is indeed behavior which would result in his termination in virtually every business establishment in this country. Emmerick has thus

come nowhere close to creating a genuine issue of material fact on his retaliatory discharge claim, and summary judgment will be entered in defendants' favor on this claim as well.

V.

*Conclusion*

For the reasons foregoing, defendants' motion for summary judgment must be granted whereby Emmerick's case against them must be dismissed with prejudice. Consequently, Emmerick's motion for a hearing with respect to this motion [Doc. 23] will be denied as moot.

Enter judgment accordingly.

*s/ Thomas W. Phillips*
United States District Judge